KITCHENS, JUSTICE, .
DISSENTING:
¶37. Because I find Douglas Walters’s assignments of error to be meritorious, I would reverse the judgment and remand this case to the Circuit Court of Rankin County. Accordingly, I respectfully dissent.
¶ 38. First, the trial eourt erred in applying the harsher penalty provided in the earlier version of the grand larceny statute. Previously, the statute provided, in pertinent part, that “[ejvery person who shall be convicted of taking and carrying away, feloniously, the personal property of another, of the value of Five Hundred Dollars ($500.00) or more, shall be guilty of grand larceny, and shall be imprisoned in the Penitentiary for a term not exceeding ten (10) years _” Miss. Code Ann. § 97-17-41(1) (2006). Effective July 1, 2014, the statute was amended to change the minimum value[8] of the “personal property of another” to “One Thousand Dollars ($1,000.00) or more, but less than “Five Thousand Dollars ($5,000.00).” Miss. Code *537 Ann. § 97-17-41(1) (Rev. 2014). The penalty was changed to imprisonment “in the Penitentiary for a term not exceeding five (5) years .Id.
¶ 39. Mississippi Code Section 99-19-33 provides:
If any statute shall provide a punishment of the same character, but of milder type, for an offense which was a crime under pre-existing law, then such milder punishment may be imposed by the court but no conviction, otherwise valid, shall be set aside and new trial granted merely because of an error of the court in fixing punishment. Such error shall only entitle the party injured to vacate or reverse the judgment as to the punishment, and the legal punishment shall then be imposed by another sentence based on the original conviction or plea of guilty.
Miss. Code Ann. § 99-19-33 (Rev. 2015). Walters states that:
This Court has interpreted Section 99-19-33 to mean that “[t]he trial court judge does not have discretion to sentence a defendant under the law in effect at the time of the commission of the crime where the sentencing statute has been amended to provide for a lesser penalty and the amended statute is in effect at the time of conviction.”
(quoting Daniels v. State, 742 So.2d 1140, 1145 (Miss. 1999), overruled by Wilson v. State, 194 So.3d 855 (Miss. 2016)) (citing West v. State, 725 So.2d 872 (Miss. 1998), overruled by Wilson v. State, 194 So.3d 855 (Miss. 2016)). Further, Walters argues, “[wjhen a statute is amended to provide for a lesser penalty, and the amendment takes effect before sentencing, the trial court must sentence according to the statute as amended.” (quoting Daniels, 742 So.2d at 1145).
¶ 40. It is true, as the majority observes, that Mississippi Code Section 99-19-1 provides that:
No statutory change of any law affecting a crime or its punishment or the collection of a penalty shall affect or defeat the prosecution of any crime committed prior to its enactment, or the collection of any penalty, whether such prosecution be instituted before or after such enactment; and all laws defining a crime or prescribing its punishment, or for the imposition of penalties, shall be continued in operation for the purpose of providing punishment for crimes committed under them, and for collection of such penalties, notwithstanding amendatory or repealing statutes, unless otherwise specially provided in such statutes.
Miss. Code Ann. § 99-19-1 (Rev. 2015) (emphasis added). But the majority states that “[t]he amendment to Section 97-17-41 does not specifically provide that the Legislature intended it to apply retroactively to crimes that occurred before its effective date.” Maj. Op. ¶ 17. With respect, I disagree. The amended Section 97-17-41 specially provided that it was to be effective “from and after July 1, 2014,” and that “[a] ny person who shall be convicted of taking and carrying away, feloniously, the personal property of another, of the value of One Thousand Dollars ($1,000.00) or more ... shall be guilty of grand larceny and shall be imprisoned in the Penitentiary for a term not exceeding five (5) years.” Miss. Code Ann. § 97-17-41 (Rev. 2014) (emphasis added). See also West, 725 So.2d at 879. Here, the statutory changes took effect July 1, 2014, and Walters was convicted on June 11, 2015.
¶ 41. It is correct, as the majority finds, that this Court has held that the date of the crime is relevant for determining under which version of the statute the jury should be instructed. In Christine Wilson *538 v. State, this court held that “section 99-19-33 and Daniels are totally irrelevant to today’s discussion” because “we are not dealing with an amended sentencing statute, but instead an amended statute as it relates to the elements of the criminal offense.” Wilson v. State, 967 So.2d 32, 42 (Miss. 2007). This Court came to the same conclusion in Moore v. State, 187 So.3d 109, 114 (Miss. 2016). But in the present case, Section 99-19-33 and Daniels would be relevant, because not only did the value element change (from $500 to $1,000), but the penalty also changed (from ten years to five years) under the amended version of Section 97-17-41 (Rev. 2014).
¶ 42. In Randy Charles Wilson v. State, however, a majority of this Court said that “[t]he Court may be able to overrule its own cases, but absent a showing beyond a reasonable doubt that a statute is unconstitutional, the Court may not overrule statutes” and that “Section 99-19-1 should dictate- today’s result.” Wilson, 194 So.3d at 868. In West, as in Daniels, this Court determined that Section 99-19-33 gave the trial court no discretion with regard to the application of the more lenient amended statutory penalty. West, 725 So.2d at 882.-The Court held that: “As we do with West, we overrule Daniels to the extent that it holds that Section 99-19-33 requires a sentencing court to apply a newer sentencing statute instead of the sentencing scheme in effect when a crime was committed.” Id. at 874. And “Section 99-19-1 clearly requires the trial court to sentence an offender under a sentencing statute in place at the time of the crime.” Id.
¶43. The majority argued that “the West Court’s striking the word ‘may’ in favor of ‘shall’ results in the judicial abrogation of Section 99-19-1, which explicitly obligates the trial court to do that which the West Court rewrote Section 99-19-33 to prohibit.” Id. at 872. In a separate opinion, I responded by pointing out that this Court had not stricken “the word ‘may’ and substitute^] the word ‘shall’ in West, but rather engaged in a reasonable interpretation of a self-contradictory statute.” Wilson, 194 So,3d at 877 (Kitchens, J., concurring in part, dissenting in part). “In its first sentence, Section 99-19-33 provides that the trial court has discretion with regard to sentencing and, in the second sentence, it provides that erroneous sentencing entitles the defendant to a reversal of the punishment and not the reversal of the conviction.” Id.
¶ 44. In the present case, as in Wilson, I maintain my position that the interpretation in Daniels and West should control and that the trial court should have sentenced Walters to “a term not exceeding five (5) years” in accordance with the 2014 amendment of Mississippi Code Section 97-17-41. As I said in Wilson, “Section 99-19-1 does not apply to this case, nor did it apply in West, because [Section 97-17-41 as amended] incorporated an effective date, after which [Walters was] ... tried, convicted, and sentenced.” Id.
¶ 45. I also agree with Walters’s second assignment of error in which he argues that the trial court erroneously granted the motion to quash the subpoena for Walters’s codefendant, Arnold Bailey. This Court has held that:
[T]he trial court’s refusal to allow [code-fendant] to be called to the stand by appellant and questioned in the presence of the jury, even though it had been demonstrated that he would refuse to answer most of the questions propounded to him on the grounds that the answers would tend to incriminate him, was reversible error.
Stewart v. State, 355 So.2d 94, 96 (Miss. 1978). In that case, Tommie Lee Stewart had been convicted of assaulting a police officer and wanted to allow Bert Brown to *539 be called to the witness stand “even though the court knew that Brown would refuse to answer most of the questions on grounds of self-incrimination.” Id. at 94. Stewart argued that his own “involvement in the fracas was limited to an attempt to pull Bert Brown off Officer Young.” Id. The Court considered that “allowing Brown to be questioned in the presence of the jury may open the door for defense counsel to attempt to impeach Brown by asking questions he knows Brown will refuse to answer and by inference get inadmissible evidence before the jury,” but the Court observed that “the potential for a miscarriage of justice is minimal, particularly in view of the fact that the jury can be instructed not to draw any inferences from the witness’ assertion of his Fifth Amendment privilege.” Id. at 95.
¶46. In Hall v. State, this Court reversed and remanded a case because an accomplice’s testimony “describing the appearance and characteristics of [the victim] was relevant to the determination of who committed the robbery” and the accomplice “should have been permitted to testify in the presence of the jury and either answer those relevant questions or claim his Fifth Amendment rights.” Hall v. State, 490 So.2d 858, 859 (Miss. 1986). Likewise, in Coleman v. State, the Court determined that the evidence was conflicting with regard to whether the defendant or the codefendant, or both, had sold cocaine. Coleman v. State, 388 So.2d 157, 159 (Miss. 1980). The Court determined that “in order to perform its function in this case, it was necessary for the jury to hear the testimony of the parties involved in the sale” and that “[i]t was important to the defense to have the jury hear the codefen-dant either answer questions or else claim her Fifth Amendment rights about her knowledge of the sale of cocaine.” Id. The court reversed and remanded the case because “it was reversible error for the circuit court to refuse the request of Coleman to question [the codefendant] in the presence of the jury and have her either answer relevant questions or claim her Fifth Amendment rights.” Id.
¶ 47. More recently, this Court reversed and remanded a defendant’s conviction of possession of cocaine with intent to distribute. Hannah v. State, 111 So.3d 1196,1201 (Miss. 2013). In that case, the trial court denied the defendant’s motion for continuance, which had been sought in order to call as a witness the codefendant. Id. at 1198. The defense contended that it was the codefendant who had been selling the drugs and that, as such, the codefendant was an indispensable witness. Id. This Court stated the following:
It is well-settled in Mississippi that a “criminal defendant must be allowed to call witnesses to the stand even though the defendant is aware that the witness, if called, will invoke the Fifth Amendment to every question.” Balfour v. State, 598 So.2d 731, 751 (Miss. 1992). “It is not enough to presume or suspicion [sic] that someoné -will assert his Fifth Amendment privilege against self-incrimination and refuse to testify. [Hé] must be called to the stand and there refuse to testify before [he] becomes unavailable due to invoking the Fifth Amendment.” Slater v. State, 731 So.2d 1115, 1117 (Miss. 1999).
Id. at 1201.
¶ 48. The Court cited Stewart and Coleman and continued: “Like the defendants in Stewart and Coleman, Hannah desired to call a witness, his coindictee, who was ‘involved in the [event] which was the subject of the criminal prosecution.’ ” Hannah, 111 So.3d at 1202 (quoting Coleman, 388 So.2d at 159). This. Court held that the circuit court’s prediction of the inevitability of the codefendant’s invocation of the Fifth *540 Amendment privilege was unavailing in light of “Hannah’s constitutional right ‘to have the jury hear the [witness] either answer questions or else claim h[is] Fifth Amendment rights.’ ” Id.
¶ 49. The majority cites Edmonds v. State in support of its argument that this Court has approved “[a] blanket claim of the [Fifth Amendment] privilege where the proceeding is criminal in nature .... ” Edmonds v. State, 955 So.2d 787, 793 (Miss. 2007) (quoting Woodham v. State, 800 So.2d 1148, 1153-54 (Miss. 2001)). First, Edmonds cites Stewart, Hall, and Coleman with approval. Edmonds, 955 So.2d at 793-94. Second, the question before the Court in Edmonds was not, as here, whether the trial court erred by quashing the subpoena of the codefendant because the codefendant would assert his privilege against self-incrimination. Rather, the question this Court answered in Edmonds was whether “a witness who intends to invoke the Fifth becomes ‘unavailable’ under [Mississippi Rule of Evidence] 804.” Id. at 793. Third, this Court in Ed-monds quoted Woodham v. State, which stated the following: “[t]he State submits that a blanket claim of privilege is proper _” Woodham, 800 So.2d at 1153. But Woodham cited no authority to support that proposition.
¶ 50. The majority finds that the claimed necessity for Bailey’s testimony never arose in Walters’s third trial. Walters’s lawyer objected as follows in the second trial:
Your Honor, as I want to go back, as I talked to you off the record awhile ago, in the presence of the prosecution, the matter of the quashing of the subpoena that was served on Mr. Arnold Bailey, actually, the codefendant of my—my client, Mr. Walters. The testimony from the state now has been developed to where they have given the inference or the inference has gone to the jury that because my client called Officer Turnage [sic] and asked for the key to that Bobcat, or whatever it is, the forklift, after Mr. Bailey was visited, I guess, because I don’t—I don’t think he was arrested at that time on February the 9th, two thousand—yeah, February the 9th of 2010— of 12, because my client came and got the key so he could return the Bobcat; that he didn’t ask for directions to the place where the—where the Bobcat was, and so that—that gives the inference that he knew where it was. When in truth and, in fact, he did come get the key, but Mr. Bailey took it and took— and took him down to where it was so he could get it and get it loaded up and take it back to McGraw Rentals in Ridgeland, Mississippi. Mr. Bailey would be probably the only one, I think he is the only one that, other than my client, that can testify that he took Mr. Walters down to where the Bobcat was.
In the second trial, the trial court stood by its original ruling denying the motion to quash Bailey’s subpoena: “And under the law, what we’ve been advised is that he’s going to claim those Fifth Amendment Rights to anything except his name, then he’s not required to be put on the stand for that purpose.”
¶ 51. The majority finds that “during Walters’s cross-examination of Investigator Turner at the third trial, he raised the issue of whether Bailey had driven Walters to Nelson’s property” and that “[a]fter consulting his report, Investigator Turner confirmed that Bailey was with Walters when he came to Nelson’s property to pick up the forklift.” On cross examination, Investigator Turner was asked in whose vehicle Bailey and Walters had driven to the property. Turner responded, “I don’t remember which vehicle they came in. It could have been Mr. Walters’. It could *541 have been Mr. Bailey’s. But, regardless, Mr. Walters did not have to ask for directions to come get the forklift that he rented.” (Emphasis added.) The same testimony that was before the jury in the second trial again came before the jury in the third trial. And Walters’s reason for having Bailey testify to rebut the State’s theory, that Walters did not have to ask for directions to retrieve the forklift he had rented and loaned to Bailey, remains a viable one.
¶ 52. I would hold here that Walters should have been allowed to question Bailey, irrespective of whether Bailey refused to answer some or all of the questions by asserting his Fifth Amendment privilege against self-incrimination. Because the trial court erred in granting the motion to quash Bailey’s subpoena and disallowing Walters’s questioning of Bailey, I would, in accordance with Stewart, Hall, Coleman, and Hannah, reverse this judgment and remand the case to the Circuit Court of Rankin County for a new trial.
¶ 53. Finally, the trial court erred in allowing Google Earth images of Walters’s property to be admitted in evidence. The trial court’s ruling with regard to the authentication and admissibility of this evidence was twofold: (1) the Google Earth images were properly authenticated under Mississippi Rule of Evidence 901, and (2) the Google Earth images were admissible under the exception to the hearsay rule found in Rule 804(b)(5).
¶ 54. As a rebuttal witness, the State called Lance Cooper, the Geographic Information System Director for Rankin County, whose job entails pinpointing property locations for tax assessment purposes. Cooper routinely relies on the historical imagery function of Google Earth. Counsel for Walters objected, arguing that Cooper had not been qualified to give expert testimony and that he could not authenticate pictures he did not take. After a proffer, the trial court ruled that Cooper’s testimony was authenticated sufficiently “to show that these pictures are what they purport to be and that they are reliable and they are used in the course of the business of the Rankin County Tax Assessor’s Office and have been confirmed to be reliable in the past.” The trial court further ruled that the images were not hearsay because “805(b)5 is applicable here, the' trustworthiness of the pictures” and that “Google Earth would have no incentive to falsify or alter the pictures.”
¶ 55. Cooper testified that, in the course and scope of his business, he comparés Google Earth images to “aerial photography that the county shoots on a 5 to 10-year basis,” and uses “that as a base comparison to base against Google Earth.” The State wanted to impeach Walters’s testimony that, the scaffolding he sold to General Recycling on February 9, 2012, belonged to him and that he had been cleaning debris and construction materials at that time to make room for a mobile home. State’s Exhibit 81 is a Google Earth image, an aerial satellite photograph, with an “Imagery Date” of May 2, 2010, and an illustrated thumb tack followed by the words “Douglas Walters Home.” It depicts a lot and what appears to be a house. State’s Exhibit 82 is a similar aerial satellite photograph, but bears an “Imagery Date” of November 4, 2011, which depicts a lot and what appears to be a mobile home. State’s Exhibit 83 is also a similar aerial satellite photograph, but bears an “Imagery Date of December 20, 2012. Cooper testified that the three photographs showed 138 Mary Miles Drive and that the photographs were true and accurate photographs on or about, May 2, 2010, November 4, 2011, and December 20, 2012.
¶ 56. To reject Walters’s hearsay argument, the majority cites U.S. v. Lizarr *542 aga-Tirado, 789 F.3d 1107, 1109 (9th Cir. 2015), which states that “a photograph merely depicts a scene as it existed at a particular time .... Because a satellite image, like a photograph, makes no assertion, it isn’t hearsay.” But, in that case, a “digital tack labeled with a set of GPS coordinates” appeared in the Google Earth satellite image, which matched the coordinates the officer who arrested the defendant recorded. Id. at 1108. The coordinates showed that the arrest took place north of the border and that the defendant had been arrested in the United States. Id.
¶ 57. The United States Court of Appeals for the Ninth Circuit observed that “[t]he tack and coordinates present a more difficult question,” because, “[u]nlike a satellite image, labeled markers added to a satellite image do make clear assertions. Indeed, that is what makes them useful.” Id. at 1109. According to the court, “[i]f the tack is placed manually and then labeled (with a name or GPS coordinates), it’s classic hearsay, akin to Aronson v. McDonald, 248 F.2d 507, 508-09 (9th Cir. 1957), where we held that hand-drawn additions to a map—there, topography lines—were hearsay.” Id. The court continued:
Because there was no evidence at trial as to how the tack and its label were put on the satellite image, we must determine, if we can, whether the tack was computer-generated or placed manually. Fortunately, we can take judicial notice of the fact that the tack was automatically generated by the Google Earth program. By looking to “sources whose accuracy cannot reasonably be questioned”—here, the program—we can “accurately and readily determine []” that the tack was placed automatically. See Fed. R. Evid, 201(b). Specifically, we can access Google Earth and type in the GPS coordinates, and have done so, which results in an identical tack to the one shown on the satellite image admitted at trial.

Id. ■

¶ 58. The court concluded that “[a] tack placed by the Google Earth program and automatically labeled with GPS coordinates isn’t hearsay” because:
[T]he relevant assertion isn’t made by a person; it’s made by the Google Earth program. Though a person types in the GPS coordinates, he has no role in figuring out where the tack will be placed. The real work is done by the computer program itself. The program analyzes the GPS coordinates and, without any human intervention, places a labeled tack on the satellite image.
Id. at 1110. The court continued, however: “That’s not to say machine statements don’t present evidentiary concerns,” because “[a] machine might malfunction, produce inconsistent results or have been tampered with.” Id. The court stated that “such concerns are addressed by the rules of authentication, not hearsay,” and that the “defendant didn’t raise an authentication objection at trial, nor does he raise one on appeal.” Id.
¶ 59. Here, a similar tack appears, but it does not contain mere coordinates, as did the Google Earth satellite image in Lizar-raga-Tirado. It bears the phrase “Douglas Walters Home.” As in Lizarraga-Tirado, no evidence was adduced as to how the tack and its label came to appear on the satellite image. But, here, we cannot say with certainty that the tack that purported to identify the “Douglas Walters Home” was generated automatically by a computer or was placed on the images manually.
, ¶ 60. Further, in Lizarragar-Timdo, no argument was made with regard to the Google Earth satellite images’ authenticity. That issue is before this Court. The trial court ruled that the Google Earth *543 satellite images could be authenticated by-Cooper under Mississippi Rule of Evidence 901(b)(9), which provides that “[evidence describing a process or system and showing that it produces an accurate result” is sufficient to authenticate a piece of evidence. M.R.E. 901(b)(9). The trial court found that the images “are used in the course of the business of the Rankin County Tax Assessor’s Office.” The trial court further ruled that “these pictures are what they purport to be,” which seemingly satisfies Mississippi Rule of Evidence 901(a), which, in pertinent part, says that “the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is” in order to authenticate a piece of evidence. M.R.E. 901(a).
¶61. The comment to Rule 901(b)(9) states that “[t]his illustration covers systems such as x-rays, some chemical tests, and computers. Example (9) does not foreclose taking judicial notice of the accuracy of a process or system.” M.R.E. 901(b)(9) cmt. In the context of a radar device, this Court has held that “a radar device reading should be deemed admissible only upon a showing of the radar device’s accuracy.” Stidham v. State, 750 So.2d 1238, 1241 (Miss. 1999) (citing M.R.E. 901(b)(9)).. In Stidham, a radar device indicated that the defendant had been driving 72 miles per hour in a 55 mile-per-hour zone. Id. at 1240. The Court held that the officer’s testimony, that “he had used a tuning fork to test the accuracy of the radar device on three occasions on the day he stopped Stidham for speeding, and that all three testings showed a ‘good’ result,” constituted a sufficient showing of the accuracy of the radar device for authentication purposes. Id. at 1241. Stidham also required, generally, proof showing that the operator of the radar device is qualified to operate the device, though expert qualifications are not required. Id. See also Johnston v. State, 567 So.2d 237 (Miss. 1990) (holding that a showing of the accuracy of an intoxi-lyzer test is a condition precedent to the test’s admissibility).
¶ 62. Here, no objective test for verification of the accuracy of the Google Earth images was administered, and no evidence was adduced to show that Cooper was qualified to utilize the Google Earth historical imagery function. The cases applying Rule 901(b)(9) require a showing of accuracy as a predicate to admissibility. Cooper testified that the satellite images were accurate and reliable, that he used the Google Earth historical imagery function in the regular , course of his business, that he used the Google Earth historical imagery function on a regular basis; and that he had compared the Google Earth image with a map the county produces every five to ten years for accuracy comparison. But he did not explain how the satellite image came to be labeled with the “Douglas Walters Home” pinpoint, nor did he explain how Google Earth generated the “Imagery Date,” which was the substance of the State’s rebuttal. Therefore, a showing of accuracy, the condition predicate to admissibility under Rule 901(b)(9), was not met through Cooper’s testimony.
¶ 63. In another case, U.S. v. Nava-Arellano, 639 Fed.Appx. 512, 513 (9th Cir. 2016), the Ninth Circuit Court of Appeals held that the district court had not abused its discretion in admitting Google Earth images. The court found that “[a]t trial, Agent Calligros satisfied the minimal burden to authenticate the Google Earth images by confirming that the photographs accurately depicted the area, the location of the border, and the approximate location where he arrested Nava. Id. The court noted the following:
Agent Calligros testified about the many ways he knew the boundary line on the *544 images was accurate: he regularly patrolled the area, and had done so for approximately a year and a half; he had hiked along the length of the border; and he had received training on the location of the border wherein he went to the border, and afterwards was shown the border on Google Maps by his field trainer. Agent Calligros testified that he had used a GPS device issued by United States Border Patrol to generate the coordinates, which were then plotted into Google Earth. Those coordinates corresponded with Agent Calligros’ testimony about the location of Nava’s arrest without reference to the Google Earth markings. Agent Calligros repeatedly identified the location based on his recollection of the arrest and his knowledge of the area. His testimony thus tended to show that the images accurately identified what they purported to identify.

Id.

¶ 64. Here, Cooper’s testimony was not akin to that of Agent Calligros in Navor-Arellcmo. Cooper did not testify that he had familiarity with the property or that he had ever been there. He specifically stated that he did not observe the photographs being taken. He merely stated that he compared' the Google Earth satellite images with aerial images taken by the county “on a 5 to 10-year basis.” Moreover, Cooper’s testimony exceeded that of Agent Calligros because Cooper stated that the Google Earth satellite images truly and accurately represented 138 Mary Miles Drive on or about May 2, 2010, November 4, 2011, and December 20, 2012. Cooper’s testimony exceeded his knowledge.
¶ 65. The majority finds that Walters failed to object to the labels and date stamps contained within the satellite images at trial or on direct appeal. Walters objected to admissibility of the satellite image photographs. And Walters’s counsel stated the following during the discussion, which occurred outside the presence of the jury, of the admissibility of the satellite image photographs under Mississippi Rule of Evidence 804(b)(5):
What the State is saying now is that because we have Google Earth that takes satellite pictures from what? 30, 35, 40, 50, 60, 100-miles above us that since it’s done by a satellite then it is totally and completely truthful and reliable. I take exception to that. I don’t think it is totally and completely reliable and trustworthy.
Judge, this—this picture, the pictures he’s wanting to offer into evidence, have a picture of a—have an imprint of a thumbtack or something similar to a thumbtack on it.
[[Image here]]
[A]ll I’m saying is, if you can alter the picture to put a thumbtack in it, you can alter the picture to do anything else when it was taken from 50 to 100-miles above the earth. I don’t think it’s trustworthy or reliable.
Moreover, objecting to the satellite image photographs’ admissibility and raising the issue on appeal sufficiently preserves the issue of the admissibility of labels and date stamps contained within the photographs for appeal. The admissibility of these photographs was considered by the trial court and has been raised on appeal. The issue is not procedurally barred.
¶ 66. Because I would give Walters a new trial, I respectfully dissent.
KING, J., JOINS THIS OPINION. DICKINSON, P.J., JOINS THIS OPINION IN PART.

. The amended version of the statute prescribed varying personal property values and penalties. See Miss. Code Ann. § 97-17-41(1)-(3) (Rev. 2014).